UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 5:22-CR-255 |
| | ) | |
| Plaintiff, | ) | JUDGE BRIDGET M. BRENNAN |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| JIMEEL GERMANY, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

On May 25, 2022, Jimeel Germany ("defendant" or "Germany") was charged in a one-count indictment with being a felon in possession of a firearm and ammunition in violation of Title 18, United States Code, Section 922(g)(1) and 924(a)(2).

Germany now moves to suppress all evidence seized and statements made during and in relation to his encounter with police on February 21, 2022. (Doc. No. 19.) The government opposed the motion (Doc. No. 26), and Germany replied in support (Doc. No. 27). An evidentiary hearing was held on November 18, 2022. The government called Officer Anthony Trimble and Officer Mark Sember, both with the Akron Police Department. The defense called Nicole Germany, defendant's wife, and Sidney Scully, an investigator with the Federal Public Defenders Office. After careful consideration of the parties' briefing and arguments, witness testimony, and evidentiary exhibits, the motion to suppress is DENIED.

I. **Factual Background**

On February 21, 2022, Officers Trimble and Sember were patrolling near Kenmore Boulevard and East 13th Street in Akron, Ohio. Officer Trimble and Officer Sember both testified to violent crimes that occurred recently in that immediate area, namely shootings at the

Circle K and robberies of the Subway and Family Dollar.  Officer Sember also testified about recent shootings in the alleyways "not even a block away from the library" where they encountered Germany.

At approximately 5:08 p.m. on February 21, 2022, Officers Trimble and Sember were traveling eastbound on Kenmore Boulevard.  The street is split by a low median with trees, light posts and shrubbery intermittently spaced within.  (Def't Ex. O.)[1]  One lane of vehicle traffic runs adjacent to the median.  *Id.*  To the right of vehicle traffic is a parking lane, with a bike lane that runs along the curb.  *Id.*

Officer Trimble was driving eastbound in a marked police cruiser.  The driver's side window was down.  Officer Sember was in the passenger seat looking to his right and away from the library.  Officer Trimble testified that he saw an individual, now known to be Germany, walking westbound towards the library.  He approximated that Germany was "not even 50 feet" away from him.  Germany was walking closest to the curb.  Germany was wearing jeans, a gray sweatshirt, and a jean jacket.[2]  (Doc. No. 19, PageID# 45.)  The jacket was unbuttoned.  (Id.)

While driving eastbound, Officer Trimble testified that he noticed a bulge protruding from Germany's right front waistband.  The bulge appeared to be pushing the jacket out from Germany's right side.  Germany and Officer Trimble made eye contact.  Germany then reached for his waistband.  Officer Trimble noticed that Germany appeared to be trying to move the bulge further back on his waistline.  Officer Trimble did not see the firearm, just the bulge.  Officer Trimble turned around once and saw that Germany was looking back at him.

---

[1] This photograph was taken by Ms. Scully on November 1, 2022.  Other than having more foliage on the trees and plants in the planters placed west of the library, the Court did not observe any significant difference between this photograph and the layout of Kenmore Boulevard captured in the body cam videos.

[2] Mrs. Germany testified that the defendant was also wearing two t-shirts under his sweatshirt.

Officer Trimble told Officer Sember to continue watching Germany.  Officer Sember testified that he then turned around and watched Germany through the plexiglass divider.  Officer Sember also witnessed Germany reaching for the waistband and making a motion from Germany's front-right appendix area to further back on his waistline.  Germany continued looking back at the patrol car.

Because the road is split by the median, the officers continued to the intersection and turned around.  Officer Trimble's body cam video captured the turn, which was under a traffic light turning red, and the rate of speed at which the officers traveled westbound after turning at the intersection.  (Gov't Ex. A (Officer Trimble's body cam video); *see also* Def't Ex. N (showing the intersection in the distance and identified by green traffic lights).)   The officers passed three businesses before reaching the beginning of the library building.  The rate of speed was not excessive, and no sirens can be heard.

As the officers approached in the cruiser, Officer Trimble said, "I'm telling ya, I can see it poking out."  (Gov't Ex. A.)  Germany was now walking closer to the library, with his wife and dog closer to the curb. (*Id*.; see also Def't Ex. P.)  Officer Trimble pulled the cruiser up to and parked along the curb in front of the library.  (*Id*.)  Officer Trimble testified that no lights or sirens were activated.  Officer Sember was the first to step out of the patrol car.  (Gov't Ex. B (Officer Sember's body cam video).)  This exchange immediately followed:

    Officer Sember:  What's up man?

    Germany:        What up?

    Officer Sember:  Come here for a minute.  [*Gesturing*]

    Germany:        I got a license.

    Officer Sember:  You got a license?

(*Id*. at 17:09:24.)

Germany told Officer Sember that he saw the officers pass by. He then said he did not have his license but could take the officers to his home to retrieve it. Officer Sember declined, instead asking for German's social security number. Germany said he did not know his social security number.

Germany then looked at Officer Trimble, who by this time had gotten out of the patrol car and was standing on the sidewalk. Germany again said that he observed the officers driving by and "saw them talking." Officer Trimble agreed and told Germany that he could see the gun. Germany's response: "Why would I be lying [about having a license to carry concealed]?"[3] Officer Sember then asked Germany for his name and date of birth. Germany gave a false name and false date of birth. Mrs. Germany remained standing close by but walked between Germany and Officer Trimble to continue observing the encounter.

Officer Sember attempted to run the name and date of birth Germany provided, explaining during his testimony that this information would readily confirm a valid and active concealed carry license. Officer Sember's body cam video captured this effort. After Officer Sember typed in the information Germany provided, an image appeared on the computer screen. Officer Sember testified that the information pulled up a photograph of an individual who did not look like Germany. Officer Sember leaned out of the cruiser to verify the information provided. Officer Sember testified he overheard Germany saying to Officer Trimble "am I being detained." Officer Sember then told Officer Trimble that Germany was "misrep," a term used to

---

[3] The Court notes that defendant's Exhibit V is a transcript of officer Trimble's body cam video. The transcript notes that Germany's response is "Why would I be with hiding?" After reviewing the video, the Court concludes that this portion of the transcript is incorrect. Germany's response is "Why would I be lying?" This response is given in the context of claiming that he has a valid license to carry concealed.

describe someone who is misrepresenting their identity.  Officer Sember testified that misrepresenting one's identity to law enforcement is an arrestable offense.

What immediately preceded Germany's statements about not being detained and knowing his rights was captured on Officer's Trimble's body cam video.  (*See* Gov't Ex. A.)  Germany can be seen standing approximately three to five feet away from Officer Trimble.  Germany expressed frustration with the officers, and Officer Trimble explained that they "see so many people with illegal firearms."  (*Id*. at 17:10:00.)  In response, Germany stated: "Then why would I be showing it?"  Officer Trimble responded by explaining that is why they did not just jump out at Germany.  Officer Trimble then asked Germany whether he thought that they would have gotten out and asked "Hey, what's up?" if they were already certain he was carrying illegally.

Germany then asked Officer Trimble if he was being detained.  Officer Trimble said yes.  Germany asked a second time.  Again, Officer Trimble said he was being detained.  Officer Trimble did not advance or place hands on Germany.  Germany then asked why he was not being put in handcuffs and began to walk away, first saying that he was not being detained and then that he knew his rights.  Germany briefly stopped walking as he continued speaking with Officer Trimble, and then began to walk away a second time. It is at this point that Germany was handcuffed.  The firearm was removed from the right-side of Germany's waist.  It was in a holster designed to secure the firearm inside of clothing and lying flat against the body.  As the body cam video captured the Officers pulling up Germany's clothing, the firearm can be seen sticking out past Germany's waistline near the rear of his right hip.  Once in hand, Officer Trimble noted that the firearm was very heavy.

After being handcuffed, Officer Sember continued his efforts to confirm Germany's identity and lawful handling of the firearm.  It was not disputed at the hearing or in the briefing that

Germany gave the officers false information.  The body cam video captured Germany providing two different spellings of the name he provided and two different dates of birth.

  II.    **Law and Analysis**

   A. **Credibility of the Witnesses**

The Court is given significant deference when making witness credibility determinations. *United States v. Haynes*, 301 F.3d 669, 679 (6th Cir. 2002) (citing *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573-75 (1985)).  "In assessing credibility, a court considers numerous factors, ultimately relying on the common sense tests of reason and logic." *United States v. Caldwell*, No. 1:13-CR-128, 2015 WL 179583, at *9 (E.D. Tenn. Jan. 14, 2015).

Germany challenges the Officers' credibility in two ways.  First, that they were too far away and there were too many obstructions to view Germany as he walked in the opposite direction on the other side of the street.  Second, that his sweatshirt and jacket concealed the firearm and prevented them from being able to observe a bulge on his waistline.  The Court will address each in turn.

   1. **Obstructions and Distance**

With the aid of the body cam videos and photographs submitted as defense exhibits, the Court concludes that the distance, trees, and light posts did not obstruct the officers' view such that testimony about seeing a bulge, hand movements, or Germany looking back was incredible. As to obstructions, the trees, low shrubbery and light posts were distanced within the median and along the curb.  The median is little more than curb height.  (*See* Def't Ex. O.)  In reviewing Officer Sember's body cam video, particularly at approximately 17:11:07 and 17:13:00, the Court finds that there were no cars parked along the route Germany was walking when he was

first seen by the Officers.[4] There were no trash cans, planters, or benches along the route Germany was walking when first observed by Officer Trimble. The trees and posts that were along the curb were not wide enough to obscure their view for any extended period of time.

As for distance, defendant argues that Officer Trimble was too far away to have credibly seen a bulge on Germany's right side. But other courts have relied on observations from similar vantage points. In *United States v. Bridges*, the encounter with police occurred at night near a streetlamp. *United States v. Bridges*, No. 16-20089, 2016 WL 3922354, at *1 (E.D. Mich. July 21, 2016). The officer, "in the driver's seat, said he saw the imprint of a large-body semi-automatic pistol in the defendant's left pants pocket. The defendant had his hands in his coat pockets at the time. As [the officer] approached, he asked if the defendant had a 'CPL,' that is, a permit to carry a concealed weapon. The defendant did not respond." *Id.* The court found it "entirely plausible that the officers were able to see the handgun in the defendant's pants pocket, even when he wore his full-length trench coat. If the defendant had his hands in his unbuttoned coat pockets, as he acknowledged he did that evening, the coat would be pulled back enough to expose the pants pocket to plain view. The Court believes that the officers saw the gun in the defendant's pants pocket immediately upon their arrival, and their subsequent actions were taken in response to the discovery of the firearm on the defendant's person." *Id.* at *3. *See also State v. Taylor*, 2009-Ohio-5822, ¶ 4, 2009 WL 3647052, at *1 (Ohio App. 8 Dist. Nov. 5, 2009) (officer's testimony that she was across four lanes of traffic when she viewed what appeared to be the handle of a gun was credible).

---

[4] Defendant's Exhibits N and O show the height of the median and the width of trees and light posts. From review of the body cam video, the large planters, garbage can, and bench were west of the library – not east of it or along the route Germany was walking when observed by the officers.

Here, the officers were traveling along the median with the driver's side window down. Germany was walking closer to the curb. Officer Trimble testified that he was no more than 50 feet away from Germany when he saw Germany. This approximation is consistent with photographs submitted at the hearing. (*See* Deft't Exs. N and O.) The distance did not logically prohibit Officer Trimble's ability to observe a bulge protruding from Germany's front, right side, nor did it prohibit either officer from observing Germany's motions or that Germany was looking back at them.[5]

The Court credits Mrs. Germany's testimony that she first observed the Officers at a farther distance. The Court also credits Ms. Scully's testimony that the distance between Mrs. Germany and the police cruiser when Mrs. Germany recalled first observing the cruiser was approximately 270 feet. But Mrs. Germany's testimony does not refute Officer Trimble's testimony as to when *he* first observed Germany. Officer Trimble testified that the officers were closer to the library when he first saw Germany and immediately looked to Germany's waistband as a "habit." That Mrs. Germany saw them first at such a distance is consistent with the Court's finding that there were no significant obstructions impeding the officers view of Germany as he walked along the sidewalk closest to the curb.

Additionally, Officer Trimble's real time comment about seeing something poking out, captured on his own body cam, is consistent with his testimony and what makes the most sense – *i.e.,* he did not see the actual firearm, but he could have seen a bulge forcing Germany's jacket to push out on the side. In reviewing Officer Trimble's body cam video at approximately 17:13:15, the end of the firearm does extend past the waistline. Crediting Officer Trimble's testimony, and

---

[5] The Court also credits Mrs. Germany's testimony that: (a) she could see the officers talking and laughing with one another; (b) the cruiser's driver-side window was down; and (c) she was either looking at the officers or straight ahead – not at Germany – while she and Germany continued walking westbound on Kenmore Boulevard.

Officer Sember's corroborating testimony about Germany's movements, a firearm, even in that particular holster, laying against his stomach to the right, appendix area of his waist would have extended past his waistline and created a bulge.

### 2. Germany's Clothing

Germany also challenges Officer Trimble's ability to observe any bulge because the firearm was concealed under a sweatshirt and jean jacket.  The Court has reviewed the videos and the still image included in Germany's motion to suppress, paying particular attention to Germany's clothing.  Officer Trimble did not testify to seeing the firearm.  He testified to a bulge, and other factors to be addressed *infra*, that caused him to believe Germany may be carrying concealed.

In the videos and still image, the waistband on Germany's right side sits lower than on his left.  (Gov't Exs. A, B; Doc. No. 19, PageID# 45.)  His sweatshirt sits higher on his right side.  (*Id*.)  The jacket is unbuttoned.  (*Id*.)  Given that (a) the firearm was very heavy, (b) the size of the firearm resulted in it extending past Germany's waistline, (c) Germany's jeans ride low and his sweatshirt appears to lift up on the right side, and (d) his jacket was unbuttoned, the Court finds Officer Trimble's testimony that he saw a bulge that pushed Germany's jacket out on the front, right side to be credible.

But it is, perhaps, Germany's own recorded statements that most significantly corroborates Officer Trimble's testimony.  Immediately upon being asked to speak with the officers, Germany volunteered that he had a license.  Germany also said he saw them pass him by and talk to one another.  And, most notably, when Officer Trimble told Germany that he saw the gun, Germany did not deny having a firearm or deny that Officer Trimble could have seen it.  Instead, he asserted he had a valid license to carry concealed.

For these reasons, the Court finds that Officer Trimble and Officer Sember testified credibly.

**B.  The Initial Encounter**

Germany asserts that the initial encounter was not consensual because no reasonable person would have felt free to walk away from the officers.  In support, Germany cites the following: he was approached by two officers, both of whom were wearing uniforms and had service weapons; the officers were in a marked cruiser; and Officer Sember said "Come here for a minute" while gesturing to Germany.

"[L]aw enforcement officers may approach an individual and ask general questions without having any reasonable suspicion of criminal activity, so long as the officers refrain from the type of intimidating behavior that would lead a reasonable person to believe that the person was not free to leave."  *United States v. Waldon*, 206 F.3d 597, 603 (6th Cir. 2000); *see also Florida v. Bostick,* 501 U.S. 429, 434-35 (1991) (explaining that "even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, ask to examine the individual's identification, and request consent to search his or her luggage – as long as the police do not convey a message that compliance with their requests is required") (citations omitted).  "Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen."  *United States v. Drayton*, 536 U.S. 194, 200 (2002); *see also Hiibel v. Sixth Judicial Dist. Ct. of Nev.*, 542 U.S. 177, 185 (2004) ("In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment.").  "Whether an encounter between a police officer and a citizen is consensual depends on the officer's objective behavior, not on any subjective

suspicion of criminal activity." *Waldon*, 206 F.3d at 603.

Absent a show of force, physical restraint, impediment, or command that an individual is not free to leave, when police officers approach an individual on the street to ask questions – including a request for identification or asking if the individual is carrying a gun – the encounter remains a consensual one. *See Mitchell v. United States*, 233 F. App'x 547, 548-51 (6th Cir. 2007) ("The district court correctly ruled that the initial encounter – when the officers approached and asked Mitchell if he heard shots and if he had a gun – was a consensual encounter. There was no physical force or show of authority. The officers did not have the squad car lights on or guns drawn; they simply approached on foot, and asked two questions."); *United States v. Foster*, 376 F.3d 577, 581-84 (6th Cir. 2004) (finding no seizure where three uniformed officers approached the suspect as he was emerging from a parked vehicle with the engine running, and asked the suspect his name, what he was doing, and whether he had identification); *Bridges*, 2016 WL 3922354, at *4 ("The officers allege that they approached and asked the defendant if he had a concealed pistol license. That activity is not forbidden by the Fourth Amendment. The defendant likewise states that the officers approached and engaged him in conversation. The parties differ in what was discussed, but under either version of the conversation, the encounter was consensual.").

> Because law enforcement officials may approach individuals and propose initial questions without having any reasonable suspicion of criminal activity, if the police do nothing to convey to the defendant that he is not free to leave, the encounter does not become a seizure for Fourth Amendment purposes as long as the individual consents to questioning, which the defendant herein did.  Absent coercive or intimidating behavior which negates the reasonable belief that compliance is not compelled, the [officer's] request for additional identification and voluntarily given information from the defendant does not constitute a seizure under the Fourth Amendment.
>
> Although defendant states that he did not feel free to go, at the motion to suppress hearing he provided no objective evidence to support this subjective belief.  Because . . . there was no coercive activity on the part of the [officers] up to the

point when they asked [defendant to approach], the stop remained a consensual encounter, which does not require reasonable suspicion for Fourth Amendment purposes.

*United States v. Peters*, 194 F.3d 692, 698 (6th Cir. 1999); *see also Drayton*, 536 U.S. at 203-04, (holding that no seizure occurred where officers began questioning bus passengers and "[t]here was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice"); *United States v. Mendenhall*, 446 U.S. 544, 553-54 (1980) (noting that a person is "'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained"); *Waldon*, 206 F.3d at 603 (stating that a seizure occurs if the officer engages in overbearing or coercive activity in making requests or conveys the message that compliance with requests is required); *cf. United States v. Thomas*, 430 F.3d 274, 278 (6th Cir. 2005) (finding no Fourth Amendment seizure when two officers knocked on the suspect's back door, told the suspect they wanted to talk to him, and asked him to come outside).

"[T]he Sixth Circuit has held that requests for an individual to come over to the officer do not constitute a seizure. Further, the fact that the defendant elected to comply does not, by itself, transform the encounter into a seizure for purposes of the Fourth Amendment." *United States v. Motley*, No. 2:13-CR-20373, 2014 WL 2740377, at *10 (W.D. Tenn. June 17, 2014) (citations omitted) (denying motion to suppress filed by felon charged with possessing a handgun); *see also United States v. Brown*, 447 Fed. App'x 706, 708–09 (6th Cir. 2012) (reasoning that "simply calling out to someone to come over to talk does not constitute a seizure"); *United States v. Matthews*, 278 F.3d 560, 561-62 (6th Cir. 2002) (reasoning that officer yelling, "Hey, buddy, come here" was not an order or a detention but rather a consensual "request that he come hither") (abrogated on other grounds by *United States v. McMurray*, 653 F.3d 657 (6th Cir. 2011)).

In this instance, the officers pulled up to the curb at a reasonable rate of speed. That can be observed in Officer Sember's body cam video as it captured the speed at which the cruiser passed three businesses before slowing down and pulling up to the curb in front of the library.[6] (Gov't Ex. B.) When the cruiser stopped, Officer Sember stepped out of the cruiser onto the sidewalk. (*Id.*) Officer Sember did not jump out or run towards Germany. (*Id.*) Officer Sember began the encounter with "What's up, man?" and then asked Germany to come over while gesturing with his right hand. (*Id.*) There were no lights or sirens. (*Id.*) Germany's ability to walk away was not obstructed. (*Id.*) Neither officer drew their weapon. (*Id.*) Neither officer laid hands on Germany at this point. (*Id.*)

The defendant's reliance on *United States v. Beauchamp*, 659 F.3d 560 (6th Cir. 2011) to challenge the consensual nature of the encounter is misplaced. In *Beauchamp*, the defendant walked away from the officers two times only to be approached a third time by one of the officers pulling up next to him, ordering him to stop, and then ordering him to step around a fence. The Sixth Circuit concluded that "a reasonable person would not have felt free to walk away a third time after an officer had given him express instructions to do otherwise." *Id.* at 567.

The facts here are quite different than those in *Beauchamp*. For the reasons stated, this encounter began as a consensual encounter.

## C.  The Investigatory Detention

Consensual encounters can quickly transform into investigatory detentions. That is what happened here.

---

[6] Mrs. Germany testified that the time between when she saw the officers and when they appeared at the curb was "fast." The Court credits this impression. It likely felt fast to Mrs. Germany, but the body cam video does not suggest the speed was such that it would have amounted to a "show of authority."

Under *Terry v. Ohio*, 392 U.S. 1 (1968), an officer can stop and briefly detain a person when the "officer has reasonable, articulable suspicion that [a] person has been or is about to be engaged in criminal activity." *United States v. Atchley*, 474 F.3d 840, 847-48 (6th Cir. 2007) (emphasis omitted) (quoting *United States v. Hensley*, 469 U.S. 221, 227 (1985)).  To find that reasonable suspicion exists, the Court must determine that, based on the totality of the circumstances, the officer had a particularized and objective basis for suspecting the particular person stopped of criminal activity.  *United States v. Hurst*, 228 F.3d 751, 757 (6th Cir. 2000).  Officers may "draw on their own experiences and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008) (quotation marks and citation omitted).

Officer Trimble testified that he has been a law enforcement officer for approximately nine years, the last five with the Akron Police Department.  He has encountered hundreds of people carrying concealed lawfully and carrying concealed unlawfully.  Officer Trimble began patrolling the Kenmore Boulevard area in 2019, and was aware that it was a high-crime area.  Officer Trimble has attended trainings specific to identifying armed gunmen.  Based on his training and experience, Officer Trimble stated that a bulge alone may not be enough to determine that someone is carrying a firearm.  His training and experience have taught him, in his words, to "build it up" based on the object and the person's behavior and "put A, B, and C together."  Officer Trimble further testified that Germany's behavior was consistent with someone concealing contraband.  After seeing the bulge at Germany's waistband and making eye contact with Germany, Germany immediately reached for his waistband, tried to move the object there, and kept looking back at officers.

Proceeding with these facts, the officers began with a consensual encounter that quickly changed to an encounter based on reasonable suspicion because when Germany was asked to come over, Germany turned, did not yet walk over, and said "I have a license." At this point, there was no longer any doubt that Germany was carrying a concealed firearm. Germany was unable to present the officers with a concealed carry license. And when he was asked for his social security number, Germany claimed not to know what it was. This was another red flag that, when considered with all of the other factors, justified a brief detention.

Under Ohio law at the time of this encounter, carrying concealed was presumptively unlawful unless the carrier could present a valid concealed carry license. Ohio Rev. Code § 2923.12(A)(2). In *State v. Higgins*, the Ohio Court of Appeals upheld the denial of a motion to suppress premised on an investigatory detention to ascertain the existence of a valid concealed carry license. *State v. Higgins*, 2016-Ohio-7890, ¶¶ 33-38, 2016 WL 6906307, at *7-8 (Ohio App. 8 Dist., Nov. 23, 2016) "Where a police officer has reasonable suspicion that an individual has committed a violation of the concealed carry laws, the officer is entitled to detain the individual in order to investigate the possibility, including whether the individual possesses a valid concealed carry license." *Id*. at ¶ 37. The defendant bears the burden of establishing that he has a valid concealed carry license at the time of the stop. *Id*.; *see also United States v. Ferguson*, No. 19-3894, 2020 WL 10140803, at *3 (6th Cir. June 3, 2020).

When Officer Trimble ultimately detained Germany, he had a reasonable and articulable suspicion that German was not lawfully carrying the concealed firearm. *Cf. United States v. Bell*, 572 F. App'x 417, 419 (6th Cir. 2014) (addressing the totality of circumstances of a *Terry* stop where the defendant was walking on a street, officers were seated in a squad car, and they noticed a gun-shaped bulge); *United States v. Graham*, No. 21-CR-20433, 2022 WL 4099447, at

*3-4 (E.D. Mich. Sept. 7, 2022) ("[B]ased on the totality of the circumstances, the Officers had reasonable suspicion that Mr. Graham was carrying a concealed pistol without a license. And this suspicion allowed them to stop Mr. Graham and investigate whether he had a license.") (collecting authorities). This detention did not violate the Fourth Amendment.

### III. Conclusion

For the foregoing reasons, Germany's Motion to Suppress is DENIED.

**IT IS SO ORDERED.**

Date: December 2, 2022

_____
BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE